IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FRANK MARUSIAK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 01 C 6181 |
| v. | ) | |
| | ) | Wayne R. Andersen |
| ADJUSTABLE CLAMP COMPANY, | ) | District Judge |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the court on the parties' cross motions for summary judgment. For the reasons stated below, plaintiff Frank Marusiak's motion for summary judgment is denied and defendant Adjustable Clamp Company's motion for summary judgment is denied in part and granted in part. The partial denial of defendant's summary judgement is without prejudice.

## BACKGROUND

The following facts are based upon the parties' statements of material facts. In 1995, plaintiff Marusiak, a self-employed woodworker and cabinetmaker, invented a clamping device that transformed a standard two-arm spring clamp into a tool capable of applying force to three surfaces simultaneously. The invention improved upon the traditional two-arm spring clamp by mounting a concave spring between its two arms. Marusiak dubbed his invention the Three-Way Spring Clamp. A standard spring clamp allows the user to apply pressure to two surfaces (one for each arm of the clamp). A common use for the standard spring clamp is to facilitate the setting of glue to wooden surfaces between the two jaws of the clamp. The Three-Way Spring Clamp has the

additional capacity to apply pressure to a surface perpendicular to that of the jaws of the clamp, which allows it to hold molding onto the edges of a table, among other things.

On October 3, 1996, Marusiak entered into an Agreement and Assignment pursuant to which Marusiak agreed to assign his rights, title and interest in his "Three-Way Spring Clamp" invention, United States Patent No. 5,765,820 ("820 patent") to defendant Adjustable Clamp Company ("Adjustable"). In return, Adjustable agreed to a one-time payment and royalties based on future sales. Additionally, at ¶ 10 of the Agreement, Adjustable promised that "it [would] proceed in good faith to attempt to manufacture and sell the clamps which are disclosed in Exhibit A and to build up diligently and extend the business of marketing such clamps as rapidly and fully as practicable."

The Agreement provided remedies for both parties to pursue if either was dissatisfied with the others' conduct or the profitability of the 820 patent. Adjustable was entitled, under ¶ 12, to "terminate [the Agreement] and the rights [the Agreement] granted at any time by giving MARUSIAK sixty (60) days previous notice in writing." Marusiak had somewhat more limited options. However, ¶ 11 of the Agreement provided that:

> In the event Marusiak requests Adjustable to commence making and selling a clamp claimed in one or more claims of any pending patent [or application covered by the Agreement] and submits a prototype of such clamp to Adjustable for its evaluation, Adjustable will, within six (6) months of submission of such prototype, advise Marusiak in writing as to whether or not it will commence making and selling such a clamp. In the event Adjustable advises Marusiak that it will not make or sell such a clamp, Adjustable will grant Marusiak the right to make, use and sell such a clamp on terms to be negotiated and agreed upon by the parties.

Furthermore, Marusiak could terminate the contract under ¶ 8 of the Agreement, which stated:

> In the event that Adjustable fails to render to Marusiak quarterly reports covering its sales and make royalty payments thereon, or breaches any other

> material provision of the Agreement, Marusiak may, at its (sic) option, by giving thirty (30) days notice in writing to Adjustable, specifying the breach complained of, terminate this Agreement [provided that Adjustable does not correct the breach in the thirty-day period].

If either party terminated the Agreement under ¶ ¶ 8 or 12, Adjustable was to assign back to Marusiak all rights to the 820 patent.

Marusiak approached Adjustable in large part because it was the manufacturer of the Pony®Style #3200 ("#3200"), among the largest selling and most widely distributed spring clamps sold in the United States. Although it was originally contemplated that Marusiak's Three Way Spring Clamp invention would be little more than a modification of the #3200, it was eventually bundled with another inventor's improvements and marketed as a Three-Way Edging Spring Clamp. The chief differences between a modified #3200 and the product that eventually went to market were that the product that went to market had swivel tips, a tension adjustment screw (which could be tightened or loosened to vary the amount of pressure at the tips), and was made out of high strength plastic, all of which may have added to the per-unit price.

Marusiak also offered Adjustable feedback on the prototypes of the Three-Way Spring Clamp demonstrated at trade shows and manufactured for sale. Particularly, on January 4, 1999, Marusiak sent a letter to Adjustable's Vice President, Robert Wooster, Jr., in which he suggested changes to the Three-Way Spring Clamp Adjustable was marketing, saying:

> If you try the clamp on these samples [which were enclosed with the letter] you will see that Sample # 3 [Marusiak's modified Three-Way Edging Spring Clamp]. . . and my steel prototype both work on all thickness and profiles, *notice that the spring never buckles and seats nicely on all edges.* That is how the Three-Way Spring Clamp should, could, and must work in order to succeed.

3

After receiving Marusiak's January 4, 1999 letter, Adjustable modified the design of the Three-Way Edging Spring Clamp in accordance with Marusiak's suggestions. These modifications cured the problems referenced in Marusiak's letter. As a result, Marusiak considered the Three-Way Edging Spring Clamp to be a "nice tool."

The parties disagree regarding the extent and effectiveness of the marketing of the Three-Way Edging Spring Clamp. However, the parties agree that Adjustable created a flyer depicting the Three-Way Edging Spring Clamp, demonstrated it at trade shows, packaged it in a "holster" type of package, placed "Dump Bins" containing it, and other products, in Tru Value and Ace Hardware Stores, and advertised the "Dump Bin" program.

Marusiak independently promoted his invention by contacting Ray Kuehn of Kuehn Bevel, a manufacturer of decorated moldings products, to promote the Three-Way Edging Spring Clamps. Kuehn requested a price from Adjustable for Three-Way Edging Spring Clamps customized with his company's logo and was quoted $2.60 per clamp. In response to this quote, Kuehn said that he was "interested in doing business, however, the price seem[s] high and doesn't leave us any room for margin." After these negotiations, Adjustable did not sell Kuehn any clamps.

Count I of Marusiak's amended complaint alleges that Adjustable breached the Agreement by: (i) never manufacturing the clamp disclosed in Exhibit A of the Agreement; and (ii) failing to exercise good faith in the marketing of the Three-Way Spring Clamp. Count II states a claim for fraud in the inducement and Count III for common law fraud, alleging that Marusiak would not have entered into the Agreement but for the intentional misrepresentations and omissions of material facts made by Adjustable regarding its intention to manufacture, sell and diligently market the Three-Way Spring Clamp. Marusiak claims Adjustable is not entitled to terminate the Agreement and seeks

damages through the year 2016. Adjustable answered the amended complaint and asserted six affirmative defenses, including doctrines of estoppel, waiver, modification, laches, fraud and inequitable conduct in the prosecution of Marusiak's patent, and lack of consideration. Marusiak seeks summary judgment on Count I and each of Adjustable's six affirmative defenses. Adjustable has moved for summary judgment on Counts I, II and III of plaintiff's amended complaint and seeks partial summary judgment on the issue of post-termination damages and denial of recovery for alleged lost royalties under Counts I and III.

## DISCUSSION

For the reasons discussed below, Marusiak's motion for summary judgment is denied in its entirety. Adjustable's motion for summary judgment is denied in part and granted in part. Specifically, Adjustable's motion for summary judgment is denied, without prejudice, as to Count I's allegation that Adjustable failed to meet its good faith obligations under ¶ 10 of the Agreement and is granted as to Count I's allegation that Adjustable had an obligation to manufacture and market a clamp identical to Exhibit A of the Agreement. Summary judgment is granted in favor of Adjustable as to Counts II & III. Adjustable's motion for partial summary judgment on the issue of post-termination damages is granted. Summary judgment is denied regarding Adjustable's affirmative defenses. The matter is set for status as to Adjustable's good faith obligations under ¶ 10 of the Agreement, with damages limited to lost royalties for the time period between October 3, 1996, the day on which the Agreement was signed, and June 22, 2002, the day Adjustable's termination of the Agreement became effective. Adjustable's affirmative defenses remain.

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The court considers the evidence in a light most favorable to the non-moving party and draws all reasonable inferences in its favor. *See Anderson*, 477 U.S. at 255.

## I. Count I

Marusiak and Adjustable both move for summary judgment on Count I. Marusiak advances two theories for Count I's breach of contract claim. Marusiak's first theory, that Adjustable was required to manufacture a specific clamp identified in Exhibit A to the Agreement, rests on an interpretation of the Agreement that Adjustable disputes. Adjustable denies the allegations forming the basis of Marusiak's second theory, that Adjustable breached its duty to "proceed in good faith" to "extend the business of marketing" Marusiak's invention "as rapidly and fully as practicable," and claims that the language contained in the Agreement is too indefinite to be enforceable under Illinois law.

### A. Failure to Manufacture an "Exhibit A" Clamp

Both Marusiak and Adjustable assert that ¶ 10 of the Agreement is not ambiguous and that they are entitled to summary judgment as a matter of law. Yet, their interpretations of the unambiguous contract and Exhibit A contradict each other. Marusiak asserts that Exhibit A was a "specific embodiment of the Three-Way Spring Clamp that Adjustable promised to make [in ¶ 10 of the Agreement]" and that Adjustable was obligated to manufacture his Three Way Spring Clamp

6

invention based on Exhibit A using a #3200 as the platform. Adjustable, alternatively, asserts that Exhibit A is a simple line drawing showing basic features of a clamp (with the flat edge spring from the 820 patent inserted), without any details of construction or other product specific identification. As such, Adjustable claims that Exhibit A encompasses a variety of forms and permits Adjustable to manufacture a variety of clamps, including the #3260 & #3261 Three-Way Edging Spring Clamp that Adjustable has made, sold and marketed pursuant to the Agreement.

Generally, contract construction and interpretation are questions of law for a court to resolve. *Houben v. Telular Corp.*, 231 F.3d 1066, 1072 (7th Cir. 2000). Under Illinois law, which the parties agree controls, the duty of the court when construing a contract is to effectuate the intent of the parties to the contract and such intent must be determined from the plain and ordinary meaning of the language of the contract unless the contract is ambiguous. *See Shaffer v. Liberty Life Assur. Co. of Boston*, 746 N.E.2d 285, 288 (Ill. App. Ct. 2001). "If the language of the contract unambiguously provides an answer to the question at hand, the inquiry is over" and the court will construe the contract according to its terms. *Moore v. Washington*, 796 F.Supp. 300, 302 (N.D. Ill. 1992). When examining contract terms, courts look to the contract as whole, giving meaning and effect to the entire document. *Owens v. McDermott, Will, & Emery*, 736 N.E.2d 145, 150 (Ill. App. Ct. 2000).

We find that the language of the Agreement is unambiguous and supports only one interpretation, that Exhibit A is merely a diagram of Marusiak's invention and not a specific embodiment of the clamps Adjustable was obligated to manufacture, market, and sell. Initially, we turn to the language of ¶ 10 of the Agreement. ¶ 10 speaks of the "clamps" which are disclosed in Exhibit A, not the "clamp" disclosed in Exhibit A. If Exhibit A referred to the one and only clamp that Adjustable bound itself to manufacture, the Agreement would to use the singular "clamp," not

7

the plural "clamps." Next, we turn to the contract as a whole. ¶ 11 of the Agreement sets forth a procedure by which Marusiak can request the manufacture of a specific version of his invention. In this paragraph, the parties use the words "prototype" and "clamp" (singular) to refer to a singular, specific clamp. This is in stark contrast to the language used in ¶ 10 of the Agreement, which does not refer to a prototype and refers to clamps in the plural. Finally, we turn to what the Agreement is lacking. Exhibit A is a simple drawing and does not have any design specifications or details of construction. Such details are contained nowhere in the Agreement. The parties' intent, as reveled by the unambiguous language of the Agreement, was that Adjustable have the discretion to manufacture Marusiak's invention in whatever manner it saw fit and was not obligated to produce a clamp identical to Exhibit A.

We note that extrinsic evidence, which this Court would turn to if it found the language of the Agreement ambiguous, further demonstrates that the parties did not intend Exhibit A as a specific embodiment of the clamp Adjustable was bound to manufacture. Perhaps the most convincing form of extrinsic evidence bearing on the parties' intent is their course of conduct in carrying out the contract provisions. *Real Estate Data, Inc. v. Sidwell Co.*, 809 F.2d 366, 374 (7th Cir 1987) ("There is no more convincing evidence of what the parties intended by their contract then to see what they did in carrying out its provisions.")

The parties' course of conduct in this case demonstrates that Exhibit A of the Agreement did not mandate that Adjustable manufacture a Three-Way Spring Clamp using the #3200 clamp as a platform. Marusiak was aware that Adjustable was not using the #3200 as a platform for his invention, yet did not claim that doing so violated ¶ 10 of the Agreement until after retaining counsel. On January 4, 1999, Marusiak wrote Adjustable and suggested several changes to the

8

product they were marketing. None of Marusiak's proposed changes required the use of the #3200 as a platform, as Marusiak now claims ¶ 10 of the Agreement required. In fact, Marusiak's January 4, 1999 letter failed to even mention Exhibit A. There is no reason to think that this was a mere oversight on Marusiak's part. Over a year later, Marusiak's counsel wrote Adjustable a letter complaining of the way in which Adjustable was marketing Marusiak's invention. Again, conspicuously absent was any mention of "Exhibit A." Marusiak also failed in either of these letters to exercise his rights under ¶ 8 of the Agreement and notify Adjustable that it had 30 days to correct a breach or he would terminate the Agreement. It is not even clear Marusiak wanted an "Exhibit A" clamp produced. Neither party contests that Marusiak had the option, under ¶ 11, to submit a prototype to Adjustable for production, yet Marusaik never exercised his rights under this paragraph. If Marusiak felt that Exhibit A was the "specific embodiment" of the clamp Adjustable was obligated to manufacture, and that Adjustable was in breach of the Agreement for years, Marusiak would have complained of the breach. Marusiak did not complain that Adjustable breached the Agreement by failing to manufacture an Exhibit A clamp until May 25, 2001. No reasonable jury could view Marusiak's actions as consistent with the proposition that the parties intended ¶ 10 of the Agreement to mandate that Adjustable manufacture a clamp identical to Exhibit A.

Adjustable is granted summary judgment on Marusaik's claims that ¶ 10 of the Agreement required Adjustable to manufacture a specific clamp disclosed in Exhibit A to the Agreement.

### B. Failure to Proceed in "Good Faith" to Market Marusiak's Invention as "Rapidly and Fully as Practicable"

Paragraph 10 of the Agreement sets forth that Adjustable "will proceed in good faith... to build up diligently and extend the business of marketing [Marusiak's invention] as rapidly and fully

9

as practicable." Marusiak alleges that Adjustable did not attempt to sell or market the invention as required by the Agreement. Adjustable claims that this language does not set forth any objective criteria for compliance and is therefore too indefinite to be enforced under Illinois law. In support of its argument, Adjustable cites a litany of cases finding "best efforts" clauses unenforceable. Such cases are distinguishable from the instant dispute. The clause at issue is not a "best efforts" clause. Instead, it is a clause promising to proceed in "good faith" to take specified actions "as rapidly and fully as practicable."

In *Roboserve Inc. v. Kato Kagaku Co, Ltd.*, the Seventh Circuit found enforceable a clause requiring the defendant to use "reasonable endeavors" to let rooms to guests likely to use Roboserve's minibars and to encourage the purchase of merchandise from those minibars. 78 F.3d 266, 271 (7thCir. 1995). The defendant in *Roboserve* argued that the "'reasonable endeavors' clause in the Agreement was too vague to be enforceable and thus could not be the basis for liability." *Id.* at 277. The Seventh Circuit cited Illinois case law contradicting the defendant's argument and found that "[t]he clause may be somewhat vague, but it still has meaning. 'Reasonable efforts' clauses are enforceable in Illinois. The question of what is 'reasonable' under a contract is an issue of fact for the trier of fact." *Id.* at 278.

A contact requirement that a party use "good faith" to "build up and diligently extend" the business of marketing a product as "rapidly and fully as practicable" may be somewhat vague, but it has substantial meaning and is enforceable. "Reasonable endeavors" can mean many things and is arguably more indefinite than the language contained in ¶ 10 of the Agreement. The "good faith" language in the Agreement is similar to the "reasonable efforts" language at issue in *Roboserve*. In *Honkomp v. Dixon*, the Illinois Appellate Court found that a contract requiring "'reasonable efforts'

should be interpreted in light of the principles of good faith and fair dealing." 97 Ill.App.3d 476, 480 (Ill.App.Crt. 1981).

Of course, just because ¶ 10 of the Agreement has enough meaning to be enforceable does not mean it is unambiguous. "A contract is ambiguous only if the language employed is susceptible of different constructions when read in its plain and ordinary meaning." *Althoff Indust., Inc. v. Elgin Med. Ctr., Inc.*, 420 N.E.2d 800, 803 (Ill. App. Crt. 1981). A clause promising to "proceed in good faith... to build up diligently and extend the business of marketing [Marusiak's invention] as rapidly and fully as practicable" is quite ambiguous. It is susceptible to several different constructions. Such a clause could mean anything from a promise to engage in some degree of marketing efforts to a covenant to undertake a much more extensive marketing campaign. Accordingly, we will look to extrinsic evidence to determine the parties' intent. *Installco Inc. v. Whiting Corp.*, 36 Ill.App.3d 776 (Ill. App. Crt. 2002).

Extrinsic evidence may shed light on the meaning of ¶ 10 of the Agreement. We note that prior to the execution of the contract, Marusiak said Adjustable would need to invest very little in marketing. He wrote to Adjustable and asserted that:

> Unlike most new products, which require substantial investment in research and development, retooling and marketing, my design would require virtually none. Your company already has in place all the necessary manufacturing, marketing and distribution resources needed to begin producing and selling this new tool.

As we discussed above, the construction of a written document, including whether or not it is ambiguous, presents a legal question. See *Russell v. Jim Russell Supply, Inc.*, 200 Ill.App.3d 855, 867 (Ill. App. Crt. 1990). Once we determine that a contract is ambiguous, we look to extrinsic evidence. Like all other facts, if the extrinsic evidence is in dispute, we will submit the case to a

jury. However, if the extrinsic evidence is uncontroverted, we will decide the issue as a matter of law.

It is undisputed that Adjustable undertook some marketing efforts. However, we lack sufficient extrinsic evidence to determine Adjustable's obligations under ¶ 10 of the Agreement. For that reason, we deny without prejudice Adjustable's motion for summary judgement as to its marketing obligations.

## II. Count II (Fraud in the Inducement) & Count III (Fraud)

Marusiak claims that Adjustable never intended to honor its obligation under the Agreement. Much of Marusiak's argument in this regard centers around his contention that Adjustable never intended to manufacture his invention using a #3200 clamp as a platform. As discussed above, Adjustable never bound itself to manufacturing Marusiak's invention using a #3200 platform. Marusiak also claims that Adjustable never intended to market his invention, as it was required to do under ¶ 10 of the Agreement. Marusiak bases his allegations of fraud on both omissions and misrepresentations of material facts.

"Broadly speaking, for a misrepresentation to constitute fraud which invalidates a contract, it must be a representation in the form of a statement of a material fact, made for the purpose of inducing a party to act; it must be false and known by the party making it to be false, or not actually believed by him, on reasonable grounds, to be true; and the party to whom it is made must be ignorant of its falsity, must reasonably believe it to be true, must act thereon to his damage, and in so acting must rely on the truth of the statement." *Sciarabba v. Chrysler Corp.*, 173 Ill.App.3d. 57, 62 (Ill. App. Crt. 1988) (internal citations and quotations omitted). A plaintiff has an additional burden in alleging a material omission. For an omission to constitute fraud, "[t]he concealment may

12

not be mere passive omission of facts during a business transaction but must have been done with the intent to deceive under circumstances creating an opportunity and duty to speak." *Farm Credit Bank of St. Louis v. Isringhausen*, 210 Ill.App.3d 724, 731 (Ill. App. Crt. 1991). "There is no duty to speak absent a fiduciary or other legal relationship between the parties." *Neptuno Treuhand-Und Verwaltungsgellschaft mbh v. Arbor*, 295 Ill.App. 3d 567, 573 (Ill. App. Crt. 1998). A plaintiff bears the burden of coming forward with evidence of all elements of a fraud claim, including intent. Thus, "[w]ithout 'specific, objective manifestations of fraudulent intent' there can be no promissory fraud" and a plaintiff cannot survive summary judgment. *Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992).

Marusiak has presented no evidence of specific manifestations of Adjustable's fraudulent intent at the time the Agreement was executed. Nor has Marusiak identified any duty which would require Adjustable to inform him of changes in its marketing efforts or lack thereof. Moreover, Marusiak has failed to show Adjustable ever breached the Agreement, much less that Adjustable not only breached the Agreement, but also fraudulently concealed its longstanding intention to do so. Since Marusiak can show neither fraudulent intent at the time of contracting, nor a duty that arose after that time, summary judgment in favor of Adjustable is appropriate on Counts II & III.

### III. Damages

Marusiak claims damages for lost royalties running through October 3, 2016. However, on April 23, 2002 Adjustable exercised its rights under ¶ 12 of the Agreement by sending notice to Marusiak of its intention to terminate the Agreement. Pursuant to ¶ 12 of the Agreement, Adjustable's termination was effective June 22, 2002. Marusiak seeks to bar Adjustable from

exercising its rights under ¶ 12 of the Agreement because "Adjustable failed to fully discharge the good faith obligation to make, sell, and diligently market the Three-Way Spring Clamp... that it incurred upon execution of the Agreement." That is, Marusiak tries to make Adjustable's execution of its obligations under ¶ 10 of the Agreement a condition precedent to Adjustable's ability to terminate the Agreement pursuant to ¶ 12 of the Agreement.

Both the plain language of the Agreement and case law are at odds with Marusiak's effort to nullify Adjustable's termination and extend the period during which he can recover damages to 2016. "Conditions precedent are generally disfavored by Illinois courts, and contracts will not be construed as having conditions precedent unless required to do so by the plain, unambiguous language." *Boulevard Bank Natl. Assn. v. Philips Metical Systems Int. B.V.*, 811 F.Supp. 357, 365 (N.D. Ill. 1993) (citing cases), *aff'd* 15 F. 3d 1419 (7th Cir. 1994). There is no language in the Agreement suggesting a condition precedent to Adjustable's right of termination under ¶ 12 of the Agreement. Accordingly, we grant partial summary judgment limiting the damages Marusiak can seek to lost royalties for the time period between October 3, 1996, the day on which the Agreement was signed, and June 22, 2002, the day Adjustable's termination of the Agreement became effective.

Adjustable also moves to bar Marusiak from seeking damages for lost royalties. Adjustable's argument that Marusiak cannot prove damages for lost royalties focuses on the admissibility of testimony by Marusiak's retained expert, Gerald G. Udell ("Udell"). However, Udell's testimony bears only on the amount of damages Marusiak could prove, not the existence of damages. At this stage of the litigation, Marusiak need only show a genuine issue of material fact as to whether he suffered damages recoverable at law, which he has done. Accordingly, Adjustable's motion for summary judgment barring Marusiak from seeking damages for lost royalties is denied.

## IV. Adjustable's First Through Fourth Affirmative Defenses

Adjustable asserted the affirmative defenses of estoppel, waiver, modification through ratification and/or acquiescence, and laches, all of which rely on the same operative facts. Marusiak argues that Adjustable's affirmative defenses are not supported by the record and moves for summary judgement dismissing all affirmative defenses. However, the parties dispute material facts. Adjustable cites Marusiak's acceptance of royalty payments, failure to object to Adjustable's marketing and manufacturing of his invention, and his approval of Adjustable's product as evidence supporting its affirmative defenses. Such evidence is sufficient to survive a motion for summary judgment. A reasonable juror could find that Adjustable relied on Marusiak's indications that no breach occurred.

## V. Adjustable's Fifth and Sixth Affirmative Defenses

Adjustable alleges fraud and failure of consideration as its Fifth and Sixth Affirmative Defenses. Adjustable claims Marusiak submitted fraudulent and/or "doctored" documents to the Patent Office and fraudulently represented to Adjustable that he held valid patents. It is undisputed that Marusiak had an obligation to prosecute his patent. After filing for his patent, Marusiak received a Notice entitled "Draftsperson's Patent Drawing Review" ("Notice"). This Notice required that changes other than formalities had to be approved by the examiner. In response to the Notice, Marusiak submitted documents that were in some manner different from documents he originally submitted to the patent office. Marusiak claims that the changes he made to drawings after receiving the Notice from the Patent Office were not material. Materiality, however, is a question of fact for the jury to decide. Adjustable also submits evidence purporting to show that Marusiak fraudulently

represented to Adjustable that he had given them all the documents he sent to the Patent Office. This is further evidence a reasonable juror could rely upon to determine that Marusiak was concealing inappropriate additions to materials submitted to the Patent Office. Accordingly, summary judgment is not warranted on Adjustable's Fifth and Sixth Affirmative Defenses.

## **CONCLUSION**

For all the foregoing reasons, plaintiff's motion for summary Judgment [265] is denied. Defendant's Motion for Summary Judgment [267] is granted in part and denied in part.

It is so ordered.

Wayne R. Andersen

United States District Judge

Dated: September 30, 2005